UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| MATTHEW A. STAKER,<br><br>        Plaintiff,<br><br>   v.<br><br>CAROLYN W. COLVIN.,<br>Acting Commissioner of Social Security<br><br>        Defendant. | No. 5:13-CV-2926-RMW-WHL<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>[Re: Docket Nos. 20, 24] |

Plaintiff Matthew A. Staker brings this action pursuant to 42 U.S.C. § 405(g) and § 1383(c) for judicial review of the final decision by an administrative law judge ("ALJ") finding plaintiff disabled as of June 15, 2011. Staker contends that the proper disability onset date is June 1, 2008. Presently before the court are the parties' cross-motions for summary judgment. Having considered the papers submitted by the parties and the entire administrative record, and for the reasons set forth below, the court GRANTS the defendant's cross-motion for summary judgment and DENIES plaintiff's motion for summary judgment.

# I.  BACKGROUND

## A.  Procedural Background

On November 24, 2009, plaintiff filed applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act and Supplemental Security Income ("SSI") under Title XVI, alleging disability beginning November 30, 2005 due to "Type III Spinal AVM." Certified Administrative Record ("AR") 18, 123-33, 183. Defendant denied plaintiff's applications on March 19, 2010. *Id.* at 98-102. Upon reconsideration, on August 19, 2010, defendant again denied plaintiff's applications. *Id.* at 105-110.

On September 15, 2010, plaintiff filed a written request for a hearing before an ALJ. AR 111-12. Two administrative hearings were held in which plaintiff appeared without counsel. *Id.* at 59-90. At the first hearing, on August 16, 2011, plaintiff requested his onset of disability date be amended to June 1, 2008. *Id.* at 74. On February 9, 2012, the ALJ issued a partially favorable decision finding plaintiff disabled as of June 15, 2011. *Id.* at 18-30. Plaintiff's last insured date was June 30, 2010, and thus plaintiff has been eligible for SSI as of the found date of disability. *Id.* at 19, 211. On March 1, 2013 the Appeals Council of the Social Security Administration denied plaintiff's request for review of the ALJ's decision. *Id.* at 5-9. Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g) and § 1383(c).

## B.  The ALJ's Findings and Analysis

Plaintiff testified to an alleged severe impairment due to persistent, acute back and chest pain which prevent him from sitting and standing for prolonged periods of time. AR 65-66. Plaintiff also alleged that he stopped working in 2008 as a result of this pain. *Id.* at 64. The ALJ addressed whether plaintiff was disabled under sections 216(i), 223(d) and 1614(a)(3)(A) of the Social Security Act, applying the five-step sequential evaluation process established by the Social Security Administration for determining whether an individual is disabled. *See* 20 C.F.R. § 404.1520(a), 416.920(a).[1] At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity

---

[1] Pursuant to 20 C.F.R. § 404.1520(a), the Social Security Administration follows a five-step sequential inquiry for determining whether an individual is disabled. If the applicant is deemed "not disabled" at any of the steps, the analysis ends there. *Id.* § 404.1520(a)(4). Step one requires the ALJ to determine whether the claimant is engaging in "substantial gainful" work activity. *Id.* §§ 404.1520(a)(4)(i), 404.1520(b). Step two requires the ALJ to determine whether the claimant has a "severe" medical impairment or combination of impairments that (1) "significantly limits

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1 | since November 30, 2005, and thus the ALJ continued to step two. AR 21. At step two, the ALJ

2 | concluded that plaintiff suffers from severe medical impairments, specifically back pain status post

3 | laminectomy and removal of hemangiomas. *Id.* At step three, the ALJ determined that plaintiff does

4 | not have an impairment or combination of impairments that meets or medically equals one of the

5 | listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, so he proceeded to step four. At

6 | step four, the ALJ found plaintiff disabled as of June 15, 2011. AR 27. Prior to June 15, 2011, the

7 | ALJ found plaintiff had residual functional capacity to perform light work so long as plaintiff was

8 | "limited to frequent stooping, kneeling, and climbing of stairs and ramps" and "avoid[ed] crawling .

9 | . . unprotected heights . . . climbing of ladders/ropes/scaffolds . . . [and] very loud noise." *Id.* at 21.

10 | In making this finding, the ALJ stated that he took into account all the symptoms that can be

11 | reasonably accepted as consistent with objective medical evidence and considered opinion evidence

12 | as required by 20 C.F.R. §§ 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p. *Id.*

13 | In evaluating plaintiff's symptoms, the ALJ followed a two-step process: first he determined

14 | whether there was an underlying medically determinable physical or mental impairment (i.e., an

15 | impairment that can be shown by medically acceptable diagnostic techniques to be reasonably

16 | expected to produce the claimant's pain or symptoms); and, second, he evaluated the intensity,

17 | persistence, and limiting effects of the plaintiff's symptoms to determine the extent to which they

18 | limit his ability to perform basic work activities. *See* 20 C.F.R. § 404.1529. The ALJ concluded that

19 | plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged

20 | symptoms" but that "[his] statements concerning the intensity, persistence and limiting effects of

---

[claimant's] physical or mental ability to do basic work activities" and (2) meets the durational requirement (a continuous period of at least twelve months). *Id.* §§ 404.1520(a)(4)(ii), 404.1520(c), 404.1509. Step three requires the ALJ to determine whether the claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926. If this requirement is met, the claimant is disabled. If not, the analysis proceeds to the next step. At step four, the ALJ must determine the claimant's residual functional capacity (i.e., ability to do physical and mental work activities on a sustained basis despite all impairments, including those that are not severe), and based thereon determine whether the claimant can perform the requirements of her past relevant work. *Id.* §§ 404.1520(e)-(f), 416.920(e)-(f), 401.1545, 416.945, SSR 96-8p. If the claimant has the residual functional capacity to do her past relevant work, she is not disabled, but if the claimant is unable to do any past relevant work or does not have any, the ALJ must proceed to the fifth and final step. The final step requires the ALJ to ask whether the claimant is able to do any other work considering her residual functional capacity, age, education, and work experience. *Id.* §§ 404.1520(g), 416.920(g).

United States District Court
For the Northern District of California

1 these symptoms are not credible prior to June 15, 2011, to the extent they are inconsistent with the

2 residual functional capacity assessment." AR 27. The ALJ noted what he considered to be

3 significant inconsistencies among plaintiff's testimony, statements made in his application

4 materials, and objective medical evidence, which he found undermined the credibility of his

5 subjective statements and complaints. *Id.* at 23-27.[2]

6       At step four, the ALJ compared plaintiff's residual functional capacity with the demands of

7 his past relevant work prior to November 30, 2005–plaintiff's initially alleged disability date–and

8 relying on Vocational Expert ("VE") testimony, concluded that plaintiff was not capable of

9 performing his past relevant work. AR 28. However, the ALJ also concluded that prior to June 15,

10 2011, plaintiff was capable of performing a "full or wide range of light work [which] includes the

11 capacity to perform sedentary work as well," and thus was not disabled prior to this date. AR 29.

12 The ALJ then concluded that beginning on June 15, 2011, plaintiff was incapable of performing any

13 jobs that exist in significant numbers in the national economy. *Id.*

14     **C.  Plaintiff's Age, Educational, and Vocational History**

15       Plaintiff was born on September 7, 1971. AR 123. Plaintiff completed two years of college

16 on June 1994, but had no further education. *Id.* at 190. From 1995 through 1997, plaintiff was

17 employed as a counselor at a group home supervising youths for approximately sixty hours per

18 week. *Id.* at 157, 162. From 1998 to 2000, plaintiff was employed as an instructional aide at a high

19

20            

[2] In reaching this conclusion, the ALJ considered plaintiff's subjective complaints; the diagnoses
21 and prognoses made by plaintiff's treating and examining physicians; the presence of several
essentially normal or only minimally abnormal examinations and diagnostic test results in the record
22 prior to October 2011; plaintiff's inconsistency of his alleged injury onset date to his doctors and at
the hearings; plaintiff's questioned credibility due to lack of candor regarding use of drugs and
23 alcohol; plaintiff's acknowledgment of performed activities at a level fundamentally inconsistent
with complaints of disabling symptoms, such as biking, trotting, and traveling. AR 22-27. The ALJ
24 additionally gave "significant weight to Dr. Katzenberg's opinion[s] because [they are] well-
supported and consistent with the record as a whole." *Id.* at 27. In an October 2011 examination, Dr.
25 Katzenberg opined that "[plaintiff] would have limitations consistent with sedentary work" due to
his injury. *Id.* Prior to this examination, on June 5, 2011, Dr. Katzenberg examined plaintiff and
26 noted "[plaintiff] has no difficulty walking on heels or toes, has no difficulty with tandem, and is
able to hop and balance on either foot without difficulty." *Id.* at 26. Dr. Katzenberg opined
27 "[plaintiff] could perform light work . . . limited to continuous climbing of stairs/ramps, continuous
stooping and kneeling, and must avoid crawling and climbing ladders/ropes/scaffolds[,] . . . work
28 related hazards and very loud noise." *Id.* Regardless of this examination, the ALJ gave plaintiff the
benefit of the doubt and concluded plaintiff was disabled as of June 15, 2011, the approximate date
plaintiff's medical marijuana card expired. *Id.* at 27.

school assisting teachers in "all aspects of classroom maintenance." *Id.* at 157, 161. In this position, plaintiff worked approximately sixteen hours per week. *Id.* at 161.

In March 2000, plaintiff was employed at a juvenile hall working as a counselor supervising youths for approximately thirty hours per week. AR 157, 160. Plaintiff continued with this employment until January 2002. *Id.* From September 2001 through October 2004, plaintiff was also employed as a program coordinator at an elementary school. *Id.* at 157, 159. In this position plaintiff performed regular administrative tasks working approximately forty hours per week. *Id.*

Most recently, plaintiff was employed as an outreach coordinator at New Horizons Elementary School from November 2007 to March 2008. AR 141, 157-58. In this position plaintiff worked approximately twenty-five hours per week supervising children. *Id.* at 158. Overlapping with this position, from July 2007 through December 2007, plaintiff was also self-employed performing bicycle repairs and maintenance. *Id.* at 148, 157, 163. In this position, plaintiff worked approximately twenty hours per week. *Id.* at 163. Plaintiff has not been employed since 2008. *Id.* at 64.

### D. Plaintiff's Medical History

Plaintiff initially alleged disability beginning November 30, 2005, due to "Type III Spinal AVM." AR 18, 123-33, 183. However, in a letter to the ALJ dated May 17, 2011, plaintiff requested that the alleged disability date be changed to "early 2008." *Id.* at 121-22. Plaintiff explained that the 2005 date was a mistake due to plaintiff's misunderstanding of the question on the application for disability benefits. *Id.* Plaintiff additionally requested at plaintiff's first hearing before the ALJ that the alleged disability date be changed to June 1, 2008. *Id.* at 74.

Plaintiff's earliest provided medical records, regarding his alleged disability, date to January 23, 2008, when plaintiff sought evaluation with Dr. Roland Sharp, M.D. *Id.* at 22, 470. Plaintiff reported that while performing yoga in 2001, he felt a "small pull in his right lower rib cage." *Id.* This injury was later aggravated while participating in soccer and martial arts. *Id*. The aggravated injury caused "excruciating" and incapacitating spasms in the lower thoracic and lumbar region (lower back). *Id.*

1    Dr. Sharp's examination did not fully corroborate plaintiff's subjective complaints. Dr.

2    Sharp noted that plaintiff's heel–toe walking was excellent. AR 22, 471. Dr. Sharp found that

3    extension of the back was good but plaintiff was hesitant to do any type of rotation. *Id.* In addition,

4    palpation of the lower thoracic and upper lumbar area revealed some "very mild dull tenderness."

5    *Id.* Dr. Sharp also observed that plaintiff had only minimal tenderness in the left distal part of the

6    costochondral junction of the 11th rib, which may have been somewhat loose at the time of

7    evaluation. *Id.* When Dr. Sharp asked plaintiff to flex forward and attempt to touch his fingertips to

8    his feet, plaintiff expressed his wish not to attempt the task. *Id.* Dr. Sharp noted that plaintiff had no

9    radicular pain pattern from the lower thoracic and upper lumbar region around his body. *Id.*

10    Dr. Sharp found that it was unlikely that plaintiff had a herniated disc. AR 23, 472. Dr.

11    Sharp expressed belief that it was possibly some low level osteoarthritis, trauma, from the acute

12    extension in the yoga movements, and that plaintiff had developed some component of facet joint

13    syndrome of the upper lumbar/lower thoracic region as a result. *Id.* Dr. Sharp recommended median

14    branch blocks and prescribed medication. *Id.*

15    On March 7, 2008, an X-ray of plaintiff's thoracic spine revealed normal results. AR 461.

16    On April 8, 2008, plaintiff reported he had experienced some rib discomfort while riding his

17    bike rather aggressively, but that the pain was not long lasting and that plaintiff had had no pain

18    flares. AR 246. The evaluating physician evaluated an MRI of the thoracic spine, which he noted

19    revealed small, non-harmful hemangiomas. *Id.* at 23, 246. The physician recommended that plaintiff

20    exercise through the pain or try a rib binder. *Id.*

21    On June 1, 2008, an X-ray of plaintiff's ribs was taken after plaintiff reported pain resulting

22    from picking up tools. AR 23, 454. The X-ray revealed normal results. *Id.* A physician diagnosed an

23    acute chest wall muscle strain. *Id.* at 23, 451.

24    On August 21, 2008, plaintiff sought treatment at the emergency room of Dominican

25    Hospital complaining of rib pain. AR 23, 444. Plaintiff reported he had not been taking any pain

26    medication. *Id.* The emergency room physician noted a normal examination and X-rays revealed

27    normal results. *Id.* at 23, 445. The emergency room physician stated that he could find no reason for

28

the claimant's rib pain. *Id.* at 23, 445-46. The physician referred plaintiff to a neurologist. *Id.* at 23, 446.

On September 5, 2008, plaintiff sought an evaluation from neurologist Dr. James Kohut, M.D. AR 481. Plaintiff reported that his pain had improved, and was no longer incapacitating in terms of limiting his movements. *Id.* However, plaintiff did state that he could not jog, twist or turn without severe pain in his thoracic region. *Id.* Plaintiff indicated that the pain was worse when he coughed or laughed. *Id.* at 481-82. Plaintiff also reported that he drank alcohol five days a week to deal with the pain. *Id.* at 482. Dr. Kohut noted that plaintiff appeared "well" and that there was no clear surgical lesion for treatment, and thus Dr. Kohut referred plaintiff to physiatry for further evaluation. *Id.* at 482-83.

On January 12, 2009, Dr. Daniel Marcus, M.D. evaluated plaintiff. AR 23, 252. Plaintiff reported pain in the mid to lower thoracic spine with radiation bilaterally and lower back pain. *Id.* Plaintiff stated his symptoms were at a 5/10 on the pain scale. *Id.* Plaintiff indicated he has had these symptoms for five years. *Id.*

During this examination, Dr. Marcus noted a normal examination except for parapsinal tenderness and other reports of pain. AR 23, 254-55. Dr. Marcus observed, among other things, full flex/side bending/rotation of the lumbar spine. *Id.* Dr. Marcus evaluated an MRI of the thoracic spine, which revealed hemangiomas at T7 and 11 with no cord signal change and adequate canal space. *Id.* at 24, 254. Dr. Marcus recommended conservative management in the form of exercises. *Id.* at 24, 255.

On January 14, 2009, Dr. Marcus administered epidural steroid injections. AR 23, 257.

On February 2, 2009, plaintiff reported significant relief from the injection but that after a few weeks, he suffered an episode of severe lumbar pain. AR 23, 251. Plaintiff stated that his current pain was at 3/10 and that the thoracic pain had nearly resolved. *Id.* Dr. Marcus noted an examination consistent with improvement, including a normal gait, bright affect, no percussive spinal tenderness, and intact motor and sensory reflexes bilaterally. *Id.* at 23, 251-52.

On May 12, 2009, while traveling, plaintiff sought treatment at an emergency room in Illinois for complaints of back pain. AR 24, 270. The attending physician noted that plaintiff

United States District Court
For the Northern District of California

1  reported back pain for two years due to benign tumors at T5/T8/T11. *Id.* at 24, 272. Plaintiff

2  reported an occasional use of alcohol. *Id.* at 272. The attending physician observed that plaintiff was

3  "pain free," but that an unknown mass was found at the medial aspect of the left lung apex. *Id.* at 24,

4  273, 275-76. The attending physician emphasized to plaintiff the importance of a need for a follow

5  up due to the unknown mass discovered, and then discharged plaintiff the same day with

6  medication. *Id.* at 24, 275-76.

7  　　　On May 21, 2009, upon return from his travels, plaintiff sought treatment for his back at the

8  Dominican Hospital emergency room. AR 24, 420. Plaintiff reported that he was recently traveling

9  in Illinois and had experienced back pain. *Id.* at 24, 421. A CT of plaintiff's chest revealed a

10  paraspinal mass on the left side located at the level of T3. *Id.* at 24, 420. The radiologist noted that

11  given the location and appearance of the lesion, the mass was most likely a neurogenic tumor. *Id.*

12  The report indicated that the mass did not appear to arise from the lung and that there was no

13  definite invasion through the neuroforamina into the spinal canal. *Id.* Also, the mass did not appear

14  to arise from the spinal canal. *Id.* The interpreting physician noted that there was no erosion and no

15  rib spreading appreciated and no other abnormal masses visualized. *Id.* The physician discharged

16  plaintiff the same day and plaintiff declined pain medication. *Id.*

17  　　　Plaintiff returned to the emergency room the following day seeking the pain medication for

18  the back and rib pain he refused the day before. AR 24, 408. A specialist reviewed plaintiff's case

19  and stated his opinion that plaintiff's tumor was probably benign. *Id.* at 24, 410. The record

20  indicates plaintiff was to return later for a cardiothoracic consultation. *Id.* at 24-25, 408. However,

21  plaintiff did not, as plaintiff claims the thoracic surgeon came into his hospital room and gave

22  plaintiff a consultation at the time of the visit, thus removing the need to schedule a consultation

23  with the surgeon for the next day. *Id.* at 13, 25.

24  　　　On July 8, 2009, plaintiff underwent surgery, called a laminectomy, to remove the

25  hemangioma at T3. AR 25, 478, 488.

26  　　　On August 20, 2009, on a visit with Dr. Kohut, plaintiff reported dryness in the left palm and

27  some intermittent numbness across his chest wall, otherwise plaintiff was doing "okay." AR 25,

28  478, 570. Dr. Kohut requested follow-up in three months. *Id.* at 25, 479.

United States District Court
For the Northern District of California

On December 8, 2009, plaintiff underwent a pain consultation at Stanford. AR 25, 488. Plaintiff told the physician that plaintiff had a biopsy of his hemangioma, which revealed an arteriovenous malformation Type III (Type III Spinal AVM). *Id.* The official record regarding this diagnosis cannot be found. *Id.* at 25. Plaintiff at the consultation reported that the pain came on "rarely," primarily when he bends to the left. *Id.* at 25, 488. Plaintiff reported that it lasts a few minutes and stops. *Id.* Plaintiff also stated that sometimes "when he takes off into a trot" he has back pain in his lower thoracic region. *Id.* Plaintiff indicated that he was not interested in taking any type of medication. *Id.* at 25, 490. The physician noted that he would await the result of an angiography before recommending any further treatment. *Id.*

On December 16, 2009, plaintiff consulted Dr. Steven Chang, M.D., Department of Neurosurgery, Stanford, on his own regarding his back pain. AR. 25, 568. Dr. Chang noted that he believed plaintiff's back pain was unrelated to the hemangiomas and made recommendations to "optimize conservative [pain controlling] measures." *Id.*

On January 8, 2010, plaintiff sought out an SSA neoplasm form to be completed by medical personnel for his SSI application. AR 568. The physician's assistant wrote on the SSA neoplasm form that the form is not applicable because the claimant does not have a neoplastic disease. *Id.* at 25, 550.

On February 17, 2010, plaintiff came into the Santa Cruz Health Center for a follow up regarding his back pain. AR 25, 599. Plaintiff reported that he drank one beer or whiskey per day and occasionally used marijuana.[3] *Id.* at 597. Plaintiff reported that he was scheduled for an angiogram at Stanford Clinics per Dr. Chang's referral. *Id.* at 25, 599. The nurse practitioner called Stanford, but Stanford explained that they do not perform this procedure. *Id.*

On February 27, 2010, plaintiff sought treatment at the emergency room of Dominican Hospital for back pain. AR 25, 609. Plaintiff reported that the pain occurred after he was lifting a table. *Id.* An MRI revealed normal results except for signs of the surgery. *Id.* at 25-26, 611. The

---

[3] Plaintiff testified at his first hearing with the ALJ that plaintiff possessed a medical marijuana card for one year but let it expire approximately around June 15, 2011, due to the drug's ineffectiveness at easing plaintiff's pain. AR 64-65. Plaintiff testified to trying marijuana approximately twice. *Id.* at 65. In plaintiff's request for a review of the ALJ's decision, plaintiff also admits to using marijuana twice, but around "June of 2010." *Id.* at 14.

attending physician administered routine and conservative treatment and discharged plaintiff the same day. *Id.* at 26, 611.

On March 8, 2010, Dr. Chang provided plaintiff with a signed letter noting plaintiff's arteriovenous malformation condition and that a spinal angiogram is needed for further investigation. AR 627.

On March 9, 2010, Dr. Garrett Lee M.D., performing plaintiff's case analysis for his DIB and SSI applications, confirmed the information from Dr. Chang's letter and then also elaborated, noting that according to Dr. Chang, plaintiff has been "doing well based on the clinical history and neurologic exam following removal of [plaintiff's] 3 cm paraspinal mass on the left at T3." AR 625. Dr. Lee noted that Dr. Chang recommended "[plaintiff] will need a formal postoperative spinal angiogram to evaluate his anatomy and see if there is any residual malformation. If it is completely gone, then he would need no further treatment." *Id.*

On June 1, 2010, plaintiff reportedly fell due to numbness in his leg and arrived at the emergency room for treatment. AR 645. Dr. Debby Schwartz, M.D. evaluated plaintiff and reported that he appeared to be in no obvious discomfort. *Id.* Plaintiff reported drinking one to three alcoholic drinks daily and no use of drugs. *Id.* Plaintiff told medical practitioners at the hospital that he felt normal, and that his current pain at a 0/10. *Id.* at 646, 655. Dr. Schwartz recommended that plaintiff continue his use of current medication and discharged plaintiff. *Id.*

On November 18, 2010, plaintiff met with Dr. Brian Brunelli, M.D., for a follow up regarding plaintiff's pains. AR 676. Plaintiff complained of worsening pain in his limbs and ribs. *Id.* Plaintiff also reported that he had been taking gabapentin 300 mg tab QID for the last several days. *Id.* Dr. Brunelli recommended a bone scan. *Id.*

On December 1, 2010, a bone scan of plaintiff was performed. AR 674. The interpreting doctor noted normal bone and soft tissue findings with nothing appearing remarkable. *Id.*

On January 4, 2011, plaintiff sought treatment with rheumatologist Dr. Alfred Petrocelli, M.D. AR 26, 663. Dr. Petrocelli reviewed plaintiff's history and commented that plaintiff had hemangiomas removed in 2008, but did not comment on the AVM Type III. *Id.* at 25, 664. At the appointment, plaintiff reported intermittent back pain and numbness in his arms. AR 26, 664.

Plaintiff also reported that he was limited in his activities. *Id.* Dr. Petrocelli found that an MRI of the lumbar spine revealed some minimal facet arthropathy. *Id.* at 26, 665. Dr. Petrocelli also noted that all of plaintiff's other diagnostic scans revealed unremarkable results. *Id.*

Dr. Petrocelli then conducted an extensive physical exam of plaintiff. AR 26, 665-67. Dr. Petrocelli noted only some minimal tenderness to palpation of the thoracic spine. *Id.* at 26, 666. Dr. Petrocelli also opined that plaintiff's symptoms were not due to a rheumatological condition and that the symptoms were likely neuropathic and perhaps non-surgical. *Id.* at 26, 667. Dr. Petrocelli commented that he could find no objective explanation for plaintiff's symptoms and that plaintiff should seek out a neurologist and physical medicine physician for further evaluation. *Id.*

On June 5, 2011, consultative examiner and neurologist Dr. Daniel Katzenberg, M.D., evaluated plaintiff. AR 26, 680. Plaintiff reported pain in his chest from the lower rib cage to the neck. *Id.* Plaintiff also reported pain in his back and rib cage when he turned to the right. *Id.* Dr. Katzenberg reviewed several medical records from early 2010. *Id.*

Dr. Katzenberg noted a normal examination except for some paraspinous muscle tenderness on the left and running through the upper thoracic region. AR 26, 681. Dr. Katzenberg noted that plaintiff had no difficulty walking on heels or toes, had no difficulty with tandem, and was able to hop and balance on either foot without difficulty. *Id.* Dr. Katzenberg opined that plaintiff could perform light work so long as it did not include: continuous climbing of stairs/ramps; continuous stooping and kneeling; and crawling and climbing ladders/ropes/scaffolds. *Id.* at 26-27, 681-87. Dr. Katzenberg further stated that plaintiff must avoid work related hazards and very loud noise. *Id.*

On October 9, 2011, plaintiff sought an evaluation from Dr. Katzenberg a second time regarding his back pain. AR 693. Plaintiff reported that his back pain had been ongoing since 2006 and that now, due to his pain, he can sit for only about five minutes at a time. *Id.*

Dr. Katzenberg observed that plaintiff was unable to walk on heels or toes, unable to tandem, and unable to hop on one foot. AR 694. Dr. Katzenberg also noted that plaintiff had decreased pin sensation on the entire left side of his body. *Id.* Dr. Katzenberg recommended that plaintiff should be limited to 1-5 minutes on his feet at a time or 3-60 minutes in an eight hour day; and limited to 10-15 minutes sitting at a time or 4-6 hours in an eight hour day with frequent

changes for repositioning. *Id.* Dr. Katzenberg further recommended that plaintiff lift and carry no more than 5-10 pounds occasionally and 1-5 pounds frequently. *Id.* These recommendations are consistent with sedentary work. *Id.* at 27, 694-700.

## II.  ANALYSIS

### A.  Standard of Review

Pursuant to 42 U.S.C. § 405(g), the court has jurisdiction to review the Commissioner's decision to deny benefits. However, the district court's scope of review is limited.  In reviewing the Commissioner's final decision to deny benefits, a district court must determine whether the Commissioner's decision is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole. *See Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999).  A reviewing court will not disturb the Commissioner's decision unless it is based on legal error or is not supported by substantial evidence. 42 U.S.C. § 405(g); *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001). In this context, evidence is substantial if it is "more than a mere scintilla but less than a preponderance; it is such relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997) (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

To determine whether substantial evidence exists to support the ALJ's decision, the court examines the administrative record as a whole and considers evidence both supporting and detracting from the Commissioner's conclusion. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). Where evidence exists to support more than one rational interpretation, the court must defer to the ALJ's decision. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). However, a district court "'may not affirm [the Commissioner's conclusion] simply by isolating a specific quantum of supporting evidence.'" *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (quoting *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989)).

### B.  Parties' Arguments

Plaintiff argues that the ALJ correctly determined that plaintiff was disabled, but that the ALJ improperly set the onset date of disability at June 15, 2011, and not June 1, 2008, as requested by plaintiff. Specifically, plaintiff argues that the ALJ made factual mistakes regarding plaintiff's

United States District Court
For the Northern District of California

1  marijuana use, which led the ALJ to erroneously find that plaintiff lacked credibility.  The court

2  finds, however, that even though the ALJ arguably overemphasized plaintiff's statements regarding

3  plaintiff's marijuana use, substantial evidence supports the ALJ's finding of a June 15, 2011,

4  disability onset date.

5  **C. Credibility**

6  In assessing plaintiff's credibility, the ALJ made several references to plaintiff's lack of

7  candor regarding his marijuana use. AR 27. Plaintiff takes exception to the ALJ's characterization

8  of plaintiff's statements as indicating that plaintiff abused marijuana. At plaintiff's first hearing,

9  plaintiff stated that he possessed a marijuana card for one year, from June 2010 to June 2011. *Id*. at

10  64-65. Plaintiff further testified that he thinks he tried marijuana twice. *Id*. At plaintiff's second

11  hearing on December 15, 2011, the ALJ asked plaintiff whether he used marijuana. *Id*. at 84.

12  Plaintiff responded that he had not used marijuana "in over a year and a half." *Id*. Plaintiff's medical

13  records also indicate that plaintiff was not a regular marijuana user. In general, plaintiff told medical

14  practitioners that he did not use marijuana, *id*. at 253, 272, though on February 17, 2010, plaintiff

15  reported that he occasionally used marijuana, *id*. at 597. In plaintiff's request for a review of the

16  ALJ's decision, plaintiff again admitted to using marijuana twice, but around "June of 2010." *Id.* at

17  14.

18  While the ALJ exaggerated the evidence of plaintiff's marijuana use in stating that plaintiff

19  "regularly" used marijuana, AR 23-24, substantial evidence supports the ALJ's adverse credibility

20  determination. Plaintiff's testimony that he only used marijuana twice in June 2010 is inconsistent

21  with his statement to a medical practitioner in February 2010 that he occasionally used marijuana,

22  and with plaintiff's statements to other medical practitioners that he did not use marijuana at all.

23  More significantly, however, the ALJ found that plaintiff's testimony as to his medical symptoms

24  lacked credibility. The ALJ observed that plaintiff refused to consistently take medication and that

25  plaintiff was able to travel. *Id.* at 23-27. Both facts indicate that plaintiff's pain was not as severe as

26  he claimed. The ALJ also refers to inconsistencies in plaintiff's alleged onset dates. *See id.* at 123-

27  33 (date set at November 30, 2005); *id.* at 272 (in 2009 plaintiff reported back pain for two years

28

due to benign tumors); *id.* at 693 (plaintiff reported that his back pain had been ongoing since 2006). Accordingly, substantial evidence supports the ALJ's finding that plaintiff lacked credibility.

### D. The Medical Record Supports the ALJ's Determination

Irrespective of the ALJ's credibility finding, the medical records independently provide substantial support for the ALJ's determination that the onset date of disability was June 15, 2011. Prior to that date, the medical records consistently show either normal test results or minimal and improving pain. *See* AR 461 (March 7, 2008 X-ray of plaintiff's thoracic spine revealed normal results), 454 (June 1, 2008 X-ray of plaintiff's ribs revealed unremarkable results), 481 (September 5, 2008, plaintiff reported his pain had improved and was no longer incapacitating), 254-55 (January 12, 2009, plaintiff's lumbar spine was capable of full flex/side bending/rotation; no cord signal change and adequate canal space; Dr. Marcus recommends conservative management in the form of exercises), 251-52 (February 2, 2009, thoracic pain nearly resolved), 488 (December 8, 2009, back pain came on "rarely," and "sometimes" "when [plaintiff] takes off into a trot"), 645-46 (June 1, 2010, plaintiff reportedly fell and arrived at the emergency room for treatment, but during evaluation plaintiff remarked he felt normal and his current pain was at a 0/10), 665-67 (January 4, 2011, minimal tenderness to palpation of the thoracic spine). At plaintiff's last examination before the date the ALJ found that plaintiff was disabled, Dr. Katzenberg noted that plaintiff had no difficulty walking on heels or toes, had no difficulty with tandem, and was able to hop and balance on either foot without difficulty. *Id.* at 681. However, several months later, on October 9, 2011, Dr. Katzenberg again examined plaintiff, this time observing significant physical regression. Dr. Katzenberg noted that plaintiff was unable to walk on heels or toes, unable to tandem, and unable to hop on one foot. *Id.* at 694. Plaintiff also had decreased pin sensation on the entire left side of his body. *Id.* Plaintiff reported he can only sit for five minutes at a time due to pain. *Id.* at 693. As a result, Dr. Katzenberg recommended that plaintiff be limited to sedentary work. *Id.* at 694-700.

The ALJ credited Dr. Katzenberg's opinions, finding that plaintiff became disabled between June 5, 2011 (plaintiff's last positive examination) and October 9, 2011 (the examination at which Dr. Katzenberg opined that plaintiff must be limited to sedentary work). The ALJ gave plaintiff the benefit of the doubt by setting the disability onset date at only ten days after plaintiff's last positive

United States District Court
For the Northern District of California

examination. Therefore, the medical record strongly supports the ALJ's decision. Even if plaintiff were correct that the ALJ's negative credibility finding was erroneous, the medical record substantially supports the ALJ's determination independent of any credibility finding.

### III.  ORDER

For the foregoing reasons, the court affirms the ALJ's finding that plaintiff was disabled as of June 15, 2011, but not before. The court GRANTS defendant's cross-motion for summary judgment and DENIES plaintiff's motion for summary judgment.

Dated: December 9, 2014



Ronald M. Whyte
United States District Judge

United States District Court
For the Northern District of California